UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

DAVID C. COLEY and DARREN K. BORDEAUX,

              Defendants.

**DECISION AND ORDER**

6:19-CR-06180 EAW

---

## BACKGROUND

Defendant David C. Coley ("Coley") stands accused, along with co-defendant Darren K. Bordeaux ("Bordeaux") (collectively "Defendants"), in a Superseding Indictment ("SI") returned on March 19, 2020, with violating 18 U.S.C. § 922(g)(1) (felon in possession of firearm or ammunition), based on events occurring on February 21, 2019. (Dkt. 25).[1] On October 5, 2020, Coley filed a motion to preclude newly disclosed body worn camera footage containing law enforcement's interaction with Coley at the time of his arrest on February 21, 2019. (Dkt. 92). The government produced the footage to Coley on or about September 18, 2020.[2] (*Id*. at ¶ 14). Alternatively, if not precluded in its

---

[1] Because of the differences in their prior convictions, Coley and Bordeaux are charged in separate counts of the SI, with Coley charged in Count 1 as an Armed Career Criminal in violation of 18 U.S.C. § 924(e)(1) and Bordeaux charged in Count 2 in violation of 18 U.S.C. § 924(a)(2). (Dkt. 25).

[2] The government explained that the footage was filed under an incorrect "CR number" and therefore inadvertently not discovered at the time of its initial disclosures.

- 1 -

entirety, Coley sought to suppress post-custodial statements that he made that are reflected in the footage. (*Id*. at ¶ 18). The government subsequently identified that it only intended to introduce the video through the time stamp of 19:23:10, which preceded the questioning challenged by Coley in his motion. (*See* Dkt. 106 at 1). Coley supplemented his motion by letter dated October 13, 2020, indicating that he still sought preclusion or suppression based on the theory that the evidence was substantially more prejudicial than probative.[3] (Dkt. 101). Coley then further supplemented his motion by letter dated October 20, 2020, arguing that the statements reflected in the footage violated his Fifth Amendment privilege against self-incrimination. (Dkt. 104). The government filed its opposition to Coley's motion on October 22, 2020 (Dkt. 106), and the Court held oral argument on October 26, 2020, at which time it indicated that Coley's motion was denied and a Decision and Order would be forthcoming setting forth the Court's reasoning in further detail (Dkt. 109).

## LEGAL STANDARD—THE PUBLIC SAFETY EXCEPTION

"It is well settled that statements obtained during a police interrogation that are not preceded by *Miranda* warnings cannot typically be used by the prosecution in its case in chief." *United States v. Simmons*, 661 F.3d 151, 155 (2d Cir. 2011). However, a narrow

---

For the reasons explained on the record on October 26, 2020, the Court denied Coley's request to preclude the video because of the late disclosure, but did grant Coley's request to file the late suppression motion.

[3]  The Court rejected Coley's argument under Fed. R. Evid. 403 for the reasons stated on the record at the appearance on October 26, 2020.

exception to that rule exists for public safety purposes—namely, "*Miranda* warnings need not precede questions reasonably prompted by a concern for the public safety or the safety of the arresting officers for a suspect's answers to be admitted as evidence of his guilt." *United States v. Newton*, 369 F.3d 659, 677 (2d Cir. 2004) (internal quotation marks omitted). The questioning must "relate[] to an *objectively* reasonable need to protect the police or the public from any immediate danger." *United States v. Estrada*, 430 F.3d 606, 612 (2d Cir. 2005) (citation omitted and emphasis in original). The questions "may not be investigatory in nature or 'designed solely to elicit testimonial evidence from a suspect.'" *Id.* (quoting *New York v. Quarles*, 467 U.S. 649, 658-59 (1984)). However, "a question need not be posed as narrowly as possible," *id.*, and "[c]ourts recognize that public safety questions are framed spontaneously in dangerous situations. Precision crafting cannot be expected in such circumstances." *Newton*, 369 F.3d at 678 (rejecting defendant's argument that law enforcement's question about "contraband" fell outside public safety exception because only firearm presented safety concern). "Thus, a question that plainly encompasses safety concerns, but is broad enough to elicit other information, does not necessarily prevent application of the public safety exception when safety is at issue and context makes clear that the question primarily involves safety." *Estrada*, 430 F.3d at 612. Application of the public safety exception requires an examination of "the totality of the relevant circumstances." *Simmons*, 661 F.3d at 155; *see also Estrada*, 430 F.3d at 612 ("[R]ecognizing the need for flexibility in situations where the safety of the public and the

- 3 -

officers are at risk, we have described the public safety exception as a function of the facts of cases so various that no template is likely to produce sounder results than examining the totality of the circumstances in a given case." (internal citations and quotation marks omitted)).

### LEGAL STANDARD—FUNCTIONAL EQUIVALENT OF INTERROGATION

The Supreme Court held in *Rhode Island v. Innis*, 446 U.S. 291 (1980), that "the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning *or its functional equivalent*." *Id*. at 300-01 (emphasis added). The Court went on to explain that the "functional equivalent" of questioning consists of "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id*. at 301. This inquiry "focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Id*.

### LEGAL STANDARD—SUBSEQUENT POST-*MIRANDA* INTERROGATION

In *Missouri v. Seibert*, 542 U.S. 600 (2004), the Supreme Court carved out an exception to the rule set forth in *Oregon v. Elstad*, 470 U.S. 298 (1985)[4], so that officers may not employ a "question first" strategy whereby they intentionally withhold *Miranda* warnings until a suspect has confessed and then give the warnings in the midst of a

---

[4] In *Elstad*, the Supreme Court held that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." 470 U.S. at 318.

coordinated and continuing interrogation. *See United States v. Williams*, 681 F.3d 35, 41 (2d Cir. 2012) ("*Seibert* lays out an exception to *Elstad* for cases in which a deliberate, two-step strategy was used to obtain the postwarning confession."). *Seibert* instructs that a court should consider five factors: (1) the completeness and detail of the questions and answers in the first round of interrogation; (2) the overlapping content of the two statements; (3) the timing and setting of the statements; (4) the continuity of police personnel; and (5) the degree to which the interrogator's questions treated the second round as continuous with the first. 542 U.S. at 615.

## THE FACTS

The undisputed evidence in the record establishes that the vehicle in which Coley was a passenger was stopped because of a report of a menacing incident with a firearm occurring less than two hours earlier. When the vehicle was pulled over, Coley attempted to flee from law enforcement. As he ran from law enforcement, Coley was observed grabbing at the waistband of his pants. The incident occurred on February 21, 2019, shortly before 7:30 p.m., and it was dark outside. It occurred at or near 196 Sawyer Street in Rochester, New York.

The video footage[5] reflects Coley being chased by Rochester Police Department Officers Seng and Laclair, who can be heard saying: "Show us your hands, show us your

---

[5] The video from Rochester Police Officer Seng's body worn camera was admitted into evidence at the trial in this matter as Government Exhibit 12 and the video from Rochester Police Officer Laclair's body worn camera was admitted as Government Exhibit

hands." Shortly thereafter, and after hopping a fence, Coley says: "I'm right here, bro, I'm right here. I'm right here. I got nervous, that's all, I got nervous. I got nervous. That's all bro. I got nervous, that's all." Officers are then heard saying "Hands behind your back," "Don't do anything crazy man," "Don't fucking move, you hear me, don't fucking move," and Coley appears to state again that he got nervous. An officer then says "I got you covered" and "Don't reach man, I'm tellin' you," and Coley responds "I'm not doing anything, bro." An officer then asks Coley "You got anything in your waistband?" to which Coley says "no." Coley then makes reference to having possession of a knife that he uses for work. Coley then says "That's all I got, bro." An officer asks Coley "What you got down your pants, you got anything down there?" to which Coley says "No." The officer then says "drugs or anything?" and Coley again responds "No." The officer then says "We're going to get you over the fence before I search you," and shortly thereafter walks Coley from the side/backyard area of 196 Sawyer Street to the front of the house, with the footage ending at 19:23:10.

---

13. The Court's summary of the statements contained in the body worn camera footage is based on the government's recitation submitted at Docket 106 and the Court's own review of the audio contained in Government Exhibits 12 and 13. While not intended to be a verbatim transcript of the interactions, the Court's recitation contains the substance of the interaction between Coley and law enforcement that is at issue. Indeed, Coley has not argued that the government's recitation of the statements is inaccurate in any manner.

A couple hours later that evening, Coley was interviewed at the Public Safety Building by Rochester Police Department Investigators Luciano and Wilcox, after being provided *Miranda* warnings.[6]

## **ANALYSIS**

The most incriminating statement that Coley makes during his encounter with law enforcement occurs at the outset—when he states that he got nervous.[7] This statement was plainly made spontaneously and not in response to any police questioning. Even Coley agrees that the statement was not made in response to any police questioning. (*See* Dkt. 104 at 2). To the extent Coley argues that being apprehended by police at gunpoint is the functional equivalent of interrogation, the Court rejects this argument under the facts present here. *See*, *e.g.*, *United States v. Escareno*, 69 F.3d 549, 1995 WL 634171, at *2 (10th Cir. 1995) (table decision) (rejecting argument that arrest at gunpoint was inherently coercive and the functional equivalent of interrogation).

With respect to the set of statements made by Coley in response to questions by law enforcement, including when he was asked "You got anything in your waistband?" (to which Coley says "no"); when he was asked "What you got down your pants, you got anything down there?" (to which Coley says "no"); and when an officer says "drugs or

---

[6] Portions of this interview were admitted into evidence at trial as Government Exhibit 19.

[7] For purposes of this Decision and Order, the Court will assume without deciding that Coley was in custody at the time he makes this initial statement to law enforcement.

anything?" (and Coley again replies "no"), all of these interactions fall within the public safety exception to *Miranda*. Under the circumstances—where Coley fled from law enforcement, where he was observed grabbing his waistband, where the stop of the vehicle involved an investigation of an earlier menacing incident involving a firearm, where it was dark outside, and where Coley had hopped a fence and police were not in full control of the situation—the questions about whether Coley had anything in his waistband or pants were reasonably prompted by a concern for public and officer safety. The fact that law enforcement had a firearm pointed at Coley during the questioning does not change the Court's analysis or its conclusion that the questions were reasonably prompted by safety concerns.

Additionally, the reference to drugs in the police questioning does not change the applicability of the public safety exception. The Second Circuit has specifically endorsed as within the pubic safety exception law enforcement's questioning of a suspect for "contraband" in *Newton*, 369 F.3d at 678-79, and whether a suspect "had anything on him that [could] hurt [the officer] or anyone on [the] field team" in *United States v. Reyes*, 353 F.3d 148, 150 (2d Cir. 2003) (alterations in original), where the court also cited with approval the Eighth Circuit's decision in *United States v. Williams*, 181 F.3d 945, 953-54 (8th Cir. 1999), "admitting statements of a narcotics defendant arrested in his apartment who was asked by police 'is there anything we need to be aware of?'" Here, the question was not just whether Coley had drugs, but rather whether he had "drugs or anything?"

which was asked just after the questions "You got anything in your waistband?" and "What you got down your pants, you got anything down there?" The inclusion of the word "drugs" based on all the circumstances does not vitiate the applicability of the public safety exception or transform an objective view of the questions from those posed for safety reasons to those posed for interrogation purposes. In the evolving dangerous situation where police were attempting to ascertain whether Coley presented a danger to their safety or the public's safety, the rapid-fire questions were framed spontaneously. *Miranda*'s safeguards are not intended to permit second-guessing from the safe confines of a courtroom about the phraseology of one word used by law enforcement when apprehending an individual during a dangerous encounter. Moreover, *Miranda*'s public safety exception does not require that a question be posed as narrowly as possible. Clearly the police officers were not in complete control of the situation even though Coley had stopped fleeing and was being taken into custody. Coley was not fully restrained at the time of the questions. While the question "drugs or anything" is broad enough to elicit information outside of safety concerns, it also encompasses concerns about officer and public safety. "[T]he purpose of the public safety exception is to allow officers to follow their legitimate instincts when confronting situations presenting a danger to public safety. There has to be some flexibility in situations where the safety of the public and the officers are at risk." *Reyes*, 353 F.3d at 155 (internal citation and quotation marks omitted).

Finally, to the extent that Coley argues that his post-*Miranda* statements were part of some deliberate, two-step strategy to obtain a postwarning confession, there is simply no support in the record for that conclusion. Different officers were involved with the post-*Miranda* interview, which took place a couple hours later at the Public Safety Building after Coley's apprehension. Under no reasonable view of the facts did that interview at the Public Safety Building constitute a coordinated and continuous second step of a pre-*Miranda* interrogation.

## **CONCLUSION**

For the foregoing reasons, and for the additional reasons set forth on the record at the appearance on October 26, 2020, Coley's motion to preclude and/or suppress (Dkt. 92) is denied.

SO ORDERED.

_____
ELIZABETH A. WOLFORD
United States District Judge

Dated:     November 10, 2020
           Rochester, New York